Slip Op. No. 17-161

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| ADAMS THERMAL SYSTEMS, INC.<br><br>                    Plaintiff,<br><br>     v.<br><br>UNITED STATES,<br><br>                    Defendant,<br><br>     and<br><br>ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE,<br><br>                    Defendant-Intervenor. | Before: Timothy C. Stanceu, Chief Judge<br><br>Court No. 16-00128 |

## OPINION

[Sustaining a scope ruling of the International Trade Administration, U.S. Department of Commerce, interpreting the scope of antidumping and countervailing duty orders on certain aluminum extrusions from the People's Republic of China]

Dated: December 6, 2017

*Richard P. Ferrin*, Drinker Biddle & Reath LLP, of Washington, D.C., argued for plaintiff.  With him on the brief were *Douglas J. Heffner* and *William R. Rucker*.

*Aimee Lee*, Senior Trial Counsel, Civil Division, U.S. Department of Justice, of New York, NY, argued for defendant.  With her on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director.  Of counsel on the brief was *Zachary S. Simmons*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

*Alan H. Price, Robert E. DeFrancesco, III*, and *Derick G. Holt*, Wiley Rein LLP, of Washington, D.C., for defendant-intervenor.

Stanceu, Chief Judge: Plaintiff Adams Thermal Systems ("ATS") contests a 2016 "Final

Scope Ruling" in which the International Trade Administration, U.S. Department of Commerce

("Commerce" or the "Department") construed the scope of antidumping and countervailing duty orders (the "Orders") on aluminum extrusions from the People's Republic of China to include certain aluminum products imported by ATS.   The court sustains the Final Scope Ruling.

## I. BACKGROUND

### A.  The Contested Determination

The determination contested in this action is *Antidumping and Countervailing Duty Orders on Aluminum Extrusions from the People's Republic of China: Final Scope Ruling on Adams Thermal Systems' Certain Fittings and Related Products for Engine Cooling Systems* (July 11, 2016) (P.R. Doc. 26), *available at* https://enforcement.trade.gov/download/prc-ae/scope/96-fitting-engine-cooling-systems-12jul16.pdf (last visited Dec. 1, 2017) (*"Final Scope Ruling"*).[1]

### B.  The Antidumping and Countervailing Duty Orders

Commerce issued antidumping and countervailing duty orders on aluminum extrusions from China in May 2011.  *Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order*, 76 Fed. Reg. 30,650 (Int'l Trade Admin. May 26, 2011) ("*AD Order*"); *Aluminum Extrusions from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 30,653 (Int'l Trade Admin. May 26, 2011) ("*CVD Order*") (collectively, the "Orders").

### C.  The Scope Ruling Application and the Merchandise at Issue

ATS filed with Commerce an application for a scope ruling ("Scope Ruling Application") on October 20, 2015, in which it sought a ruling excluding from the scope of the Orders various aluminum products produced in China, to which ATS referred as "fittings" for automotive uses.

---

[1] All citations to documents from the administrative record are to public documents or to the public version of confidential documents.  These documents are cited as "P.R. Doc. __".

*Aluminum Extrusions from the People's Republic of China: Request for Scope Ruling for Certain Fittings and Related Products for Engine Cooling Systems* (Oct. 20, 2015) (P.R. Docs. 2-4) (*"Scope Ruling Application"*).  In the Scope Ruling Application, ATS argued that each fitting, which was produced from a single piece ("blank") of extruded aluminum alloy, was subjected to further processing following extrusion that, according to ATS, placed it outside the scope of the Orders.  *See id.* at 2-6.  After conducting an administrative proceeding, Commerce issued the Final Scope Ruling, in which it ruled that the fittings are within the scope of the Orders.

<u>D.  Proceedings before the Court</u>

ATS commenced this action on July 19, 2016.  Summons (July 15, 2016), ECF No. 1; Compl. (July 19, 2016), ECF No. 6.  Now before the court is ATS's motion for judgment on the agency record, which is opposed by defendant United States and defendant-intervenor the Aluminum Extrusions Fair Trade Committee.  Mot. of Pl. Adams Thermal Systems, Inc. for J. on the Agency R. under Rule 56.2 (Feb. 17, 2017), ECF No. 25; Mem. of Points and Authorities of Pl. Adams Thermal Systems, Inc. in Support of its Mot. for J. on the Agency R. (Feb. 17, 2017), ECF No. 28 ("Pl.'s Mem.").[2]  The court held oral argument on October 26, 2017.

**II.  DISCUSSION**

<u>A.  Jurisdiction and Standard of Review</u>

The court exercises subject matter jurisdiction according to section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), which grants jurisdiction over civil actions brought

---

[2] Originally, plaintiff filed both public and confidential versions of its memorandum in support of its motion for judgment on the agency record and its reply.  At oral argument, the court questioned whether photographs in these submissions, which depicted what plaintiff described as representative part numbers for the merchandise at issue, qualified for confidential treatment.  In response, plaintiff refiled the memorandum and the reply, disclosing to the public the photographs for which plaintiff previously had claimed confidential treatment.

under section 516A of the Tariff Act of 1930, 19 U.S.C. § 1516a.[3]  Among the decisions that

may be contested under Section 516A is a determination of "whether a particular type of

merchandise is within the class or kind of merchandise described in an . . . antidumping or

countervailing duty order."  19 U.S.C. § 1516a(a)(2)(B)(vi).  In reviewing a contested scope

ruling, the court must set aside "any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law."  *Id.*

§ 1516a(b)(1)(B)(i).

B.  The Scope Language of the Orders, as Is Relevant to This Dispute

The scope language is set forth in the antidumping duty order and in the countervailing

duty order; each version is essentially identical.  The Orders apply to "aluminum extrusions

which are shapes and forms, produced by an extrusion process, made from aluminum alloys

having metallic elements corresponding to the alloy series designations published by The

Aluminum Association commencing with the numbers 1, 3, and 6 (or proprietary equivalents or

other certifying body equivalents)."  *AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*, 76 Fed.

Reg. at 30,653.

Each Order also provides that "[a]luminum extrusions are produced and imported in a

wide variety of shapes and forms, including, but not limited to, hollow profiles, other solid

profiles, pipes, tubes, bars, and rods" and that "[a]luminum extrusions that are drawn subsequent

to extrusion ('drawn aluminum') are also included in the scope."  *AD Order*, 76 Fed. Reg.

at 30,650; *CVD Order*, 76 Fed. Reg. at 30,654.

The scope language further provides that "[a]luminum extrusions are produced and

imported with a variety of finishes (both coatings and surface treatments), and types of

---

[3] All statutory citations herein are to the 2012 edition of the United States Code and all regulatory citations herein are to the 2016 edition of the Code of Federal Regulations.

fabrication." *AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*, 76 Fed. Reg. at 30,654.  As to

fabrication, the scope language also states that "[a]luminum extrusions may also be fabricated,

*i.e.*, prepared for assembly.  Such operations would include, but are not limited to, extrusions that

are cut-to-length, machined, drilled, punched, notched, bent, stretched, knurled, swedged,

mitered, chamfered, threaded, and spun." *AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*,

76 Fed. Reg. at 30,654.

The scope language goes on to state that "[s]ubject aluminum extrusions may be

described at the time of importation as parts for final finished products that are assembled after

importation, including, but not limited to, window frames, door frames, solar panels, curtain

walls, or furniture." *AD Order*, 76 Fed. Reg. at 30,650-51; *CVD Order*, 76 Fed. Reg. at 30,654.

"Such parts that otherwise meet the definition of aluminum extrusions are included in the scope."

*AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654.

The scope language also provides that "[s]ubject extrusions may be identified with

reference to their end use, such as fence posts, electrical conduits, door thresholds, carpet trim, or

heat sinks (that do not meet the finished heat sink exclusionary language below)." *AD Order*,

76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654.  "Such goods are subject

merchandise if they otherwise meet the scope definition, regardless of whether they are ready for

use at the time of importation." *AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg.

at 30,654.

## C.  The Merchandise at Issue in this Case

ATS states in the Scope Ruling Request that "[t]he fittings in question are all machined

from an extruded aluminum blank." *Scope Ruling Application* at 2.  "In general, the production

process starts with a rough blank made of 6 series aluminum that is formed through an extrusion

press (feedstock)." *Id.* at 8.  Each individual blank is cut from an extrusion that has a cross

section, typically in the approximate form of an "L" or in the form of a hexagon, depending on

the intended shape of the finished product.  *See id.* at 7-16.  Each fitting is the result of multiple

fabrication processes, including machining, *see id.*; ATS characterizes these processes as

creating "the shape and form of the fittings." *Id.* at 4.  Some of the machining is performed by

automated "CNC" (computer numeric control) equipment.  *See id.* at 8-9, 11, 12, 13, 14.  ATS

further describes each of the fittings as "designed in conjunction with vehicle manufacturers'

system integration teams, in order to achieve leak-free sealing points between the heat exchanger

and the vehicle subsystem within the space allotted." *Aluminum Extrusions from the People's*

*Republic of China: Response to the Department's April 28, 2016 Second Supplemental*

*Questionnaire on ATS Fittings for Engine Cooling Systems* at 3 (May 13, 2016) (P.R. Doc. 21).

"The design process must balance the typical tight space claims demanded in today's vehicles,

with the need for minimal resistance to fluid flow." *Id.*  All products are imported as finished

merchandise, with no further processing needed prior to use.  *Id*. at 4-5.

Citing a submission by ATS, Commerce described each of the fittings at issue in the

Final Scope Ruling.  *Final Scope Ruling* at 6-12 (citing *Aluminum Extrusions from the People's*

*Republic of China: Submission of Production Descriptions: Fittings for Engine Cooling Systems*

(May 25, 2016) (P.R. Doc. 25)).  The product descriptions, as set forth in the Final Scope Ruling,

refer to 43 products, identified by individual part numbers, each of which ATS described as

"leak free and structurally robust." *Id*.

Of the 43 products, 37 are designed and manufactured for use in connection with

automotive oil coolers or, in several applications, fuel coolers.  The descriptions for 33 of these

fittings refer to oil or fuel "flow path[s]" between an oil or fuel cooler (*i.e.*, the heat exchanger)

and any of various other systems on a vehicle. *Final Scope Ruling* at 6-11.[4]  These particular

fittings are designed to direct fluid into and out of the heat exchanger without imparting

excessive flow resistance to the respective system. *Id.*  An illustration of one of the 33 products,

Part No. 824884, described by plaintiff as representative of the group, shows a fitting machined

from an L-shaped blank with square corners. *See* Pl.'s Mem. 7.  Plaintiff describes the

fabrication process as involving grinding, milling for smoothness, CNC machining, drilling to

create the passageway for fluid, threading to allow connection to other parts, polishing, and

cleaning with ultrasonic equipment. *Id.* at 6.  In the illustration, the finished fitting appears to

have a rectangular-shaped base with a cylindrical threaded coupling protruding from one side of

the rectangular base and a shorter, cylindrical non-threaded coupling protruding from an adjacent

side. *See id.* at 7.  The two couplings are at right angles to each other. *See id.*  It appears from

the illustration that the drilling is at right angles to create the flow path. *See id.*

Another part for use in connection with an oil cooler is a "mounting pin," Part

No. 828105. *Final Scope Ruling* at 11; Pl.'s Mem. 10.  This part is machined, using a CNC

lathe, from an extruded aluminum blank of hexagonal cross section, then polished and cleaned

using ultrasonic equipment. Pl.'s Mem. 10.  The center area of the pin retains a hexagonal shape,

but both ends have been machined to cylindrical shapes, one threaded and the other non-threaded

and beveled at the edge. *See id.*

---

[4] This description applies to Part Nos. 709151, 807603, 808963, 812129, 812246, 812247, 812929, 813138, 823108, 823377, 824026, 824741, 824884, 824885, 824886, 824970, 824971, 825710, 825741, 826146, 826152, 826153, 826184, 826431, 827240, 827782, 828391, 828434, 828694, 829217, 831197, 831198, and 832119. *Antidumping and Countervailing Duty Orders on Aluminum Extrusions from the People's Republic of China: Final Scope Ruling on Adams Thermal Systems' Certain Fittings and Related Products for Engine Cooling Systems* at 6-11 (July 11, 2016) (P.R. Doc. 26), *available at* https://enforcement.trade.gov/download/prc-ae/scope/96-fitting-engine-cooling-systems-12jul16.pdf (last visited Dec. 1, 2017) ("*Final Scope Ruling*").

Also for use in connection with an oil cooler is a "plug," Part No. 826142.  *Final Scope Ruling* at 11; Pl.'s Mem. 9-10.  This small part is fabricated from an extruded aluminum blank of hexagonal cross section by means of a grinding machine and a CNC lathe, polished, and cleaned using ultrasonic equipment.  Pl.'s Mem. 9.  One end retains a hexagonal shape; the other is cylindrical and threaded.  *See id.* at 10.  A similar fitting, Part No. 824682, is described in the Scope Ruling as a "cap for oil cooler."  *Final Scope Ruling* at 8.

The remaining article for an oil cooler installation, Part No. 824879, is described as a "threaded fastener."  *Final Scope Ruling* at 11-12; Pl.'s Mem. 11.  The fastener is fabricated from an extruded aluminum blank of hexagonal cross section by means of a cutting machine, CNC lathe, polishing wheel, and ultrasonic cleaning equipment.  Pl.'s Mem. 11.  Most of the length of the finished fastener is comprised of a threaded shank; the head of the fastener retains a hexagonal shape.  *See id.*  The fastener is drilled throughout.  *See id.*

A second group consists of four products (Part Nos. 823375, 826926, 830456, and 830463) used in automotive air conditioning systems.  *Final Scope Ruling* at 11; Pl.'s Mem. 7-8.  Each of these fittings is described as a "flow path between the air conditioning system and the condenser (heat exchanger)."  *Final Scope Ruling* at 11.  Each is produced from an extruded aluminum blank of hexagonal cross section.  Pl.'s Mem. 7-8.  The fabricating is performed by a CNC lathe or milling machine.  *Id.*  Plaintiff's representative illustration (for Part No. 823375) shows that one end of the fitting retains a hexagonal shape, but that end is machined to a form resembling a beveled nut and, at the very end, another hexagonal shape.  *See id.* at 8.  The other end is cylindrical and threaded.  *See id.*  According to plaintiff's description, "the

drilling and boring processes produce a hollow area inside the fitting that allows fluid to flow

through the fitting from the condenser to the engine."[5]  *Id*. at 7.

The third and final group consists of two products (Part Nos. 826493 and 829507) used

with automotive radiators.  *Final Scope Ruling* at 11; Pl.'s Mem. 8-9.  Each is described as a

"coolant flow path between the engine cooling system and the radiator; designed to direct

coolant into and out of the radiator without imparting excessive flow resistance to the cooling

system."  *Final Scope Ruling* at 11.  An extruded aluminum blank is machined in a CNC lathe,

ground in a grinding machine, drilled in a CNC drilling machine, polished, and cleaned using

ultrasonic equipment.  Pl.'s Mem. 8.  An illustration for Part No. 826493, which plaintiff

describes as representative of the group, shows a blank in a modified L shape and a finished

fitting with a rectangular-shaped base, a cylindrical threaded coupling protruding from one side

of the rectangular base, and a longer, cylindrical non-threaded coupling protruding from an

adjacent side that is specially shaped at the tip.  *See id*. at 9.  The two couplings are at right

angles to each other.  *See id.*

D.  The Scope Ruling Is Not Based on an Invalid Finding and Is Not Otherwise Contrary to Law

It is undisputed that each of the fittings at issue in this case was produced from a single

aluminum extrusion and that the extrusion was of a 6 series aluminum alloy, which is one of the

alloys specified in the scope language as covered by the Orders.  Plaintiff does not contest any

other specific factual finding Commerce reached in support of its ultimate determination.

Instead, in claiming that the Final Scope Ruling is unsupported by substantial evidence and

---

[5] This description appears to refer erroneously to the engine.  Because it is described as a part for air conditioning systems that carries refrigerant, it would appear that the fitting would carry refrigerant from the condenser to other parts of the air conditioning system.

otherwise contrary to law, ATS argues that Commerce applied an impermissible interpretation of the scope language.

### 1.  The Terms of the Scope Language Are Reasonably Interpreted to Include ATS's Fittings

The Department's regulations, in 19 C.F.R. § 351. 225(d), provide for issuance of a final scope ruling "based upon the application" for a scope ruling.  The regulations further provide, in § 351.225(e), that "where further inquiry is warranted," Commerce will issue a final scope ruling upon the conducting of a "scope inquiry."  In this case, Commerce issued the Final Scope Ruling according to § 351.225(d), *i.e.*, based on the application rather than on a scope inquiry.  The regulations provide that Commerce will do so "[i]f the Secretary can determine, based solely upon the application [for a scope ruling] and the descriptions of the merchandise referred to in paragraph (k)(1) of this section, whether a product is included within the scope of an order." 19 C.F.R. § 351.225(d).  With respect to the "descriptions of the merchandise referred to in paragraph (k)(1) of this section," the regulations provide that "the Secretary will take into account . . . [t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the [International Trade] Commission."  *Id.* at § 351.225(k)(1).

In *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002), the Court of Appeals for the Federal Circuit ("Court of Appeals") expressed the fundamental tenet that "review of the petition and the investigation may provide valuable guidance as to the interpretation of the final order" but "they cannot substitute for language in the order itself," which is "a predicate for the interpretive process."  Plaintiff relies in part on *Duferco* in arguing that Commerce misconstrued the scope language to include its fittings.  Pl.'s Mem. 21, 40 ("Commerce's *Final Scope Ruling* is not in accordance with law because it interprets the *Orders*

in a manner contrary to its terms."). As plaintiff correctly notes, *Duferco* holds that scope

"orders may be interpreted as including subject merchandise only if they contain language that

specifically includes the subject merchandise or may be reasonably interpreted to include it." *Id.*

at 40 (quoting *Duferco*, 296 F.3d at 1089). ATS argues that the scope language of the Orders is

not reasonably interpreted to include its fittings. The court disagrees.

Plaintiff argues, first, that the scope language must be construed to confine the Orders to

products that retain the general shape and form imparted by the extrusion process. According to

this argument, post-extrusion fabrication that significantly alters the basic cross-section profile of

the extrusion, such as that performed to produce ATS's fittings, necessarily results in a product

outside the scope. Pl.'s Mem. 15-19. Plaintiff's argument begins with the first sentence of the

scope language, which reads as follows:

> The merchandise covered by the order is aluminum extrusions which are
> shapes and forms, produced by an extrusion process, made from aluminum alloys
> having metallic elements corresponding to the alloy series designations published
> by The Aluminum Association commencing with the numbers 1, 3, and 6 (or
> proprietary equivalents or other certifying body equivalents).

*AD Order*, 76 Fed. Reg. at 30,650; *see also CVD Order*, 76 Fed. Reg. at 30,654. ATS reads the

words "produced by an extrusion process" as a limitation on the meaning of the words "shapes

and forms" that confines the scope to articles retaining the basic shape obtained upon extrusion.

This, however, is not the only plausible interpretation. The first sentence of the scope language

also might be read in the context of the remaining scope language as signifying that the articles

subject to the Orders are those that meet three *separate* conditions: they must be "shapes or

forms" in the sense of goods that have been "shaped" or "formed" (not only by extrusion but also

by post-extrusion processing), they must be produced by an extrusion process (even if also

produced by drawing, finishing, or fabricating), and they must be made from a specified

aluminum alloy.

In support of its interpretation, ATS points to scope language giving examples of shapes

and forms in which extrusions are produced: "Aluminum extrusions are produced and imported

in a wide variety of shapes and forms, including, but not limited to, hollow profiles, other solid

profiles, pipes, tubes, bars, and rods." Pl.'s Mem. 16-17 (quoting *AD Order*, 76 Fed. Reg.

at 30,650). Plaintiff argues that these processes, and other extrusion processes not mentioned,

result in an article "that has the same cross-sectional shape as the die used to create it." *Id*. at 19

(also describing "fittings" as "downstream products not identified as aluminum extrusions" that

"may use an extrusion-type shape or form as an input" but that are "subsequently reshaped

through a series of complex downstream fabrication processes into an *entirely different shape*").

Even if the court were to presume, *arguendo*, that ATS's interpretation of the scope

language is a reasonable one, it could not conclude that the Department's contrary interpretation,

under which ATS's fittings are within the scope despite having undergone post-extrusion

fabrication processes that alter the cross-sectional shape, was *not* reasonable. In specifying that

goods subject to the Orders may have been subjected to drawing, finishing, and fabricating

operations, the scope language plainly does not exclude those articles that are not "produced"

entirely "by an extrusion process." In addressing the non-extrusion processes that may have

occurred, the scope language does not expressly impose the limitation on basic shape or form

that ATS espouses: it does not state that the mentioned fabricating operations, and others not

mentioned, are limited to those conducted only to an extent that does not alter, or alter

significantly, the cross section resulting from the extrusion process. Moreover, the scope

language lists, as non-exclusive examples of fabricating, extrusions that are "machined, drilled,

punched, notched, bent, stretched, knurled, swedged, mitered, chamfered, threaded, and spun."
*See AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*, 76 Fed. Reg. at 30,654.  Indeed, the
unqualified mention of some of the processes, including, for example, bending and stretching,
implies more than a minor or incidental change in the cross-sectional shape obtained by
extrusion alone.

ATS next argues that the fabrication processes contemplated by the scope language are
only those that "prepare" the extrusion for "assembly."  Pl.'s Mem. 23-29.  Plaintiff bases this
argument on the following scope language: "Aluminum extrusions may also be fabricated, *i.e.*,
prepared for assembly."  *See AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*, 76 Fed. Reg.
at 30,654.  ATS reads the words "prepared for assembly" to refer only to fabrication "processes
that assist in the fitting together of the extrusions into a complete machine, structure, or unit of a
machine."  Pl.'s Mem. 24-25.  According to plaintiff, the Department's interpretation of the
scope language renders the scope term "prepared for assembly" as "mere surplusage."  *Id*.
at 30-31.

Here again, the court cannot conclude that plaintiff's narrow interpretation is the only
reasonable one.  The words "fabricated, *i.e.*, prepared for assembly" as used in the scope
language also reasonably could be interpreted to refer to any post-extrusion, pre-assembly
fabrication, on the premise that assembly, or a similar end use of an article of subject
merchandise, ordinarily would occur only after the part has been "prepared" by being fabricated
into its final form.  In addition, the reference in the scope language to which ATS directs the
court's attention, which begins with the words "[a]luminum extrusions *may also* be
fabricated . . . ," follows a broader reference to finishing and fabrication, as follows: "Aluminum
extrusions are produced and imported with a *variety* of finishes (both coatings and surface

treatments), and *types of fabrication*." *AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*, 76 Fed.

Reg. at 30,654 (emphasis added).  When read in the entirety, the plain meaning and context of

the references to fabrication in the scope language do not compel the narrow interpretation of the

words "fabricated, *i.e.*, prepared for assembly" that ATS advocates.

ATS argues, further, that the scope language recognizes that "[a]t some point, the further

fabrication of an extruded aluminum product *must* result in a substantial transformation" and that

"otherwise, the scope language would be more definitive and could have stated that it 'includes

all products made from or out of aluminum extrusions.'" Pl.'s Mem. 34.  Plaintiff submits that

its fittings, when compared to the aluminum extrusions from which they were fabricated, have

undergone a substantial transformation because they have a "new name, character, and

{/or}use." *Id.* (quoting *United States v. Gibson-Thomsen Co.*, 27 C.C.P.A. 267, 273 (1940)).

Because of the way in which the scope language is written, the court need not reach the issue of

whether ATS's fittings underwent a "substantial transformation" following extrusion.  Although

the scope language throughout refers to subject merchandise as "extrusions," it does not

expressly confine the scope of the Orders to goods that have not been processed so as to have a

name, character, or use different than that of an aluminum extrusion that has not undergone

significant post-extrusion processing.  As to name and use, the scope language specifically

includes articles "described at the time of importation as parts for final finished products that are

assembled after importation," albeit only if they "otherwise meet the definition of aluminum

extrusions," which definition refers to "shapes and forms, produced by an extrusion process."

*AD Order*, 76 Fed. Reg. at 30,650-51; *CVD Order*, 76 Fed. Reg. at 30,653-54.  The scope

language also places within the scope articles "identified with reference to their end use" (again,

only if they otherwise meet the "scope definition," which apparently is a reference to the

definition of aluminum extrusions also).  *AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed.

Reg. at 30,654.  Given the explicit references to how in-scope articles may be "described" or

"identified," and to products that have been fabricated after extrusion to make them suitable for

particular end uses, the court cannot agree plaintiff's argument that the concept of substantial

transformation, as explicated in *Gibson-Thomsen* and subsequent decisions, required Commerce

to exclude its fittings from the scope of the Orders.

      In addition to *Gibson-Thomsen*, plaintiff relies on *Crawfish Processors All. v. United

States*, 483 F.3d 1358 (Fed. Cir. 2007), arguing that "[t]he Federal Circuit has held that the

substantial transformation concept can be used to determine whether an imported product has

been so fundamentally changed as to be outside the scope of an antidumping duty order."  Pl.'s

Mem. 34 (citing *Crawfish Processors All.*, 483 F.3d at 1363-64).  This case is inapposite.  In

*Crawfish Processors Alliance*, the issue was whether an order that applied to "crawfish tail

meat," regardless of how "preserved or prepared," included a cooked product that included

crawfish tail meat as one of a significant number of combined ingredients.  The case before the

court does not involve a mixture or combination including the good named in the scope

language.

      In summary, plaintiff has not made the case that Commerce unreasonably construed the

scope language of the Orders so as to include articles having undergone fabrication that

significantly altered their cross-sectional shape, that did more than "prepare" an extrusion "for

assembly" (in plaintiff's conception of the term), or that resulted in a "substantial

transformation" in the *Gibson-Thomsen* sense.

2.  The Department's Application of the § 351.225(k)(1) Factors

In the Final Scope Ruling, Commerce rejected ATS's argument that the scope language

limited the scope of the Orders based upon the degree or type of fabrication performed on an

extrusion.  *See Final Scope Ruling* at 23-26.  Commerce specifically rejected ATS's contention

that the "prepared for assembly" language, which ATS highlights before the court, accomplishes

such a limitation, as well as the argument that the final shape of subject merchandise must be

imparted by the extrusion process.  *Id*. at 23-24.  In doing so, Commerce relied on two of its

prior scope rulings, the "Machine Parts Scope Ruling" and the "Motor Cases Scope Ruling,"

both of which it issued in 2012.  *Id.* at 24 (citing *Antidumping Duty (AD) and Countervailing*

*Duty (CVD) Orders: Aluminum Extrusions from the People's Republic of China (PRC): Final*

*Scope Ruling on Precision Machine Parts* (Mar. 28, 2012), *available at*

https://enforcement.trade.gov/download/prc-ae/scope/13-IDEX-Precision-Machine-Parts-

20120328.pdf (last visited Dec. 1, 2017) ("*Machine Parts Scope Ruling*") and *Antidumping Duty*

*(AD) and Countervailing Duty (CVD) Orders: Aluminum Extrusions from the People's Republic*

*of China (PRC): Final Scope Ruling on Motor Cases* (July 6, 2012), *available at*

https://enforcement.trade.gov/download/prc-ae/scope/14-UQM-Motor-Cases-20120706.pdf (last

visited Dec. 1, 2017) ("*Motor Cases Scope Ruling*")).

Commerce stated in the Final Scope Ruling that in the Machine Parts Scope Ruling "the

Department explained that 'We find that the investigation *contemplated* that subject merchandise

would undergo specialized machining processes, and did not include a limit on the amount or

specialty of the fabrication (emphasis added).'" *Id.* (citing *Machine Parts Scope Ruling* at 15).

Commerce also stated in the Final Scope Ruling that it had found in the Motor Cases Scope

Ruling "that [the] CNC production process used to produce motor cases is a fabrication process

that does *not* result in a product being distinct from subject merchandise included [in] the scope

of the Orders." *Id.* at 25 (citing *Motor Cases Scope Ruling* at 14-15).[6]

Responding to defendant's position that Commerce reached a decision supported by the

factors in 19 C.F.R. § 351.225(k)(1), plaintiff argues in its reply brief that these factors do not

support the "overbroad" interpretation of the scope advocated by defendant.  Reply Br. of Pl.

Adams Thermal Systems, Inc. in Supp. of its Mot. for J. on the Agency R. 6 (June 19, 2017),

ECF No. 34 ("Pl.'s Reply").  The court is not persuaded by this argument.

ATS looks for support for its argument in the preliminary and final determinations of the

U.S. International Trade Commission ("ITC") in the investigation, citing passages in which the

ITC states that aluminum extrusions are produced by forcing heated aluminum billets in a

"hydraulic extrusion process" that uses a metal die, that almost any shape can be produced

"based on the 'design of the die,'" and that "[p]roduction can be shifted between different shapes

merely by changing the die[]." *Id.* (citing *Certain Aluminum Extrusions from China*, USITC

Pub. 4153, Inv. Nos. 701-TA-475 and 731-TA-1177 (June 2010), *available at*

https://www.usitc.gov/sites/default/files/publications/701_731/pub4153.pdf (last visited

Dec. 1, 2017) (Preliminary Determination); *Certain Aluminum Extrusions from China*, USITC

Pub. 4229, Inv. Nos. 701-TA-475 and 731-TA-1177 (May 2011), *available at*

https://www.usitc.gov/sites/default/files/publications/701_731/pub4229.pdf (last visited

Dec. 1, 2017) (Final Determination)).  In these quoted statements, the ITC described the

extrusion process, not post-extrusion machining processes, and therefore did not address the

specific issue raised by this case.  ATS also quotes language from the petition to the effect that

---

[6] In the Final Scope Ruling, Commerce also addressed and rejected the arguments ATS made before it concerning substantial transformation, *Final Scope Ruling* at 25, and due process, *id.* at 26, both of which arguments ATS raises before the court.

the extrusion process enables the formation of a wide variety of shapes and forms, *id.* at 7, but

this quotation also fails to address the question of whether ATS's merchandise must be

considered to be outside the scope because of the nature and extent of post-extrusion fabrication.

While ATS argues that "the ITC report and the Petition do not support the Department's

interpretation, because those sources all emphasize that the shape and form is produced by the

extrusion process, as opposed to some post-extrusion manufacturing step," *id.* at 7, these sources

do not support a conclusion that the *final* shape and form of a subject article must be that created

by the extrusion process.

        Plaintiff also argues that the Machine Parts Scope Ruling is "neither binding nor

persuasive." *Id.* at 15-16.  As to the former, ATS argues that "neither the Federal Circuit nor this

Court has ever reviewed the Machine Parts Scope Ruling." *Id.* at 15.  As to persuasiveness, ATS

argues that this ruling, like the one it is challenging here, "was based on an unreasonable

interpretation of the scope language." *Id.*  These arguments miss the point.  The Department's

consideration of the Machine Parts Scope Ruling (and the Motor Cases Scope Ruling) was in the

context of the application of one of the criteria of 19 C.F.R. § 351.225(k)(1) ("The descriptions

of the merchandise contained in . . . the determinations of the Secretary (including prior scope

determinations)").  The Machine Parts Scope Ruling involved an aluminum housing for a

vacuum pump assembly and aluminum bodies for certain high pressure valves.  *Machine Parts*

*Scope Ruling* at 2.  The "products at issue start with an extruded block of aluminum upon which

various cutting, edging, and drilling operations are performed by means of a computer numerical

control (CNC) precision machine process." *Id.* at 3.  ATS's disagreement with it

notwithstanding, the ruling is directly relevant to the issue Commerce confronted when

considering ATS's Scope Ruling Application.  Similarly, the subject of the Motor Cases Scope

Ruling was "inner and outer motor cases . . . for use in connection with high-efficiency, water-cooled electric motors," the "feedstock" for which "consist[ed] of extruded aluminum alloy tubing that is subsequently cut into motor casings by means of a computer numerical controlled (CNC) precision machine process." *Motor Cases Scope Ruling* at 2.  The applicant described the necessary machining as "complex and expensive."  *Id*. at 7.  Because these rulings are on point, and because the scope language is reasonably interpreted to include ATS's fittings, it was permissible under § 351.225(k)(1) for Commerce, on this record, to rely on them in support of its conclusion that the post-extrusion processing performed on ATS's fittings did not result in articles that are outside the scope of the Orders.

     With respect to the petition, plaintiff makes the additional point that the final scope language differed from that originally proposed by the petitioner, which did not contain the "prepared for assembly" language.  Pl.'s Mem. 28-29; Pl.'s Reply 11.  ATS argues that the change, proposed by the petitioner during the investigation in response to a request by Commerce for clarification of the proposed scope of the investigation, demonstrates the petitioners' intent that the scope of the Orders would be limited in the way ATS advocates.  Pl.'s Mem. 28-29; Pl.'s Reply 11.  The difficulty with this argument is plaintiff's reading too much into the petition amendment.  As plaintiff stated in its brief, "[i]n its April 9, 2010 scope amendment letter, petitioners stated that '{w}e have changed the scope language [in] relation to fabrication to clarify that such processing prepares the extrusion for assembly and does not include final finished goods containing subject aluminum extrusions.'"  Pl.'s Mem. 29 (citation omitted).  Responding to defendant's emphasizing the words "does not include final finished goods containing subject aluminum extrusions," plaintiff argues that "the petition amendment had *two* purposes: (1) clarification that the in-scope 'fabrication' processing contemplated only

prepares the aluminum extrusion for assembly; *and* (2) clarification that the in-scope processing

language is not intended to include final finished goods within the scope."  Pl.'s Reply 11-12.

The court is unconvinced by this argument because the change made by the petition amendment

does not establish that petitioners intended the term "prepared for assembly" to have the narrow

meaning plaintiffs would now attribute to it.  As the court discussed earlier in this Opinion, the

term "prepared for assembly" might refer to any post-extrusion fabrication that results in a good

ready for assembly.  The petitioners' intent regarding the specific issue this case presents is made

even less clear by the reference to "final finished goods," which is a reference to goods

"containing subject aluminum extrusions," *i.e.*, assemblies.

In summary, plaintiff has not shown that Commerce misapplied the factors in 19 C.F.R.

§ 351.225(k)(1) in support of an "overbroad" interpretation of the scope language.  As a related,

and alternative, argument, ATS submits that "[g]iven the fact that Commerce has never

interpreted the phrase 'prepared for assembly,' at a minimum, Commerce should not have

resolved this scope question on the basis of the (k)(1) factors" and should have applied the

factors of 19 C.F.R. § 351.225(k)(2).  Pl.'s Mem. 45.  This argument presumes that Commerce

misapplied the (k)(1) criteria in concluding that ATS's fittings are subject to the Orders.  Rather

than misapply the (k)(1) criteria, Commerce reached the sound conclusion that ATS's fittings are

within the scope of the Orders.  Under its regulations, Commerce is to resort to the (k)(2) criteria

"[w]hen the above [*i.e.*, (k)(1)] criteria are not dispositive."  19 C.F.R. § 351.225(k)(2).  As the

court has discussed, Commerce reasonably relied upon the Machine Parts Scope Ruling and the

Motor Cases Scope Ruling, both of which presented the same basic question as that raised by

ATS's Scope Ruling Application and resolved it in a way that supports the decision in the Final

Scope Ruling and refutes the construction of the scope language plaintiff advocates.  Plaintiff's

reliance on certain language in the petition, the petition amendment, and the ITC determinations

is misplaced because these sources do not support the arguments it makes in favor of limits on

the degree of fabrication that subject merchandise may undergo.

 3.  The Final Scope Ruling Is Not Unlawful for Vagueness or for Lack of Notice or Due Process

        Plaintiff's final argument is that the court should reject the Department's "overbroad"

interpretation of the scope language because it results in a "single vague order" that does not give

importers adequate notice of what is subject to antidumping or countervailing duties.  Pl.'s

Mem. 39-44.  ATS argues that the "extreme interpretation" underlying the Department's position

on the scope of the Orders, which, in its view, would place within the scope all shapes and forms

of covered aluminum alloys that went through an extrusion machine at any point in the

production process, "would lead to results that are not only absurd, but also violate any

reasonable norms of notice and due process."  *Id.* at 44.  Plaintiff adds that "[f]or example, with

the aluminum extrusion blanks that ATS uses as feedstock to reduce to finished fittings, not only

would the fittings be deemed to be subject merchandise under Commerce's overbroad definition,

but also the *scrap shavings* from the lathe and machining process would be considered to be

subject merchandise, if those shavings were imported into the United States."  *Id.*  According to

plaintiff, "scrap shavings are 'shapes and forms' read in the same overbroad sense that

Commerce applied to the Orders" and "[t]he scrap shavings of the aluminum went through the

extruding machine, just like the finished fittings*." Id.*  Responding to defendant's argument that

Commerce reasonably construed the scope language, ATS argues that Commerce interprets the

scope language of the Orders "in the broadest possible manner, which is unreasonable because it

does not give importers fair notice of what is and is not covered."  Pl.'s Reply 22.  ATS argues,

further, that "[t]he Court should remand with instructions to Commerce to interpret the scope

language in a manner that provides a reasonable limit on the types of further manufacturing that

extruded aluminum may undergo and still remain subject merchandise." Pl.'s Mem. 44. For

several reasons, plaintiff's arguments do not convince the court that the interests of notice and

due process compel the court to remand the Final Scope Ruling to Commerce.

In the administrative proceeding giving rise to this case, the Department's responsibility

was to decide whether the fittings described in the Scope Ruling Application were within the

scope of the Orders. Commerce was not required to announce an interpretation resolving future

questions as to that scope, and the Final Scope Ruling did not do so. Nor does the court agree

that Commerce, in this case, unreasonably has interpreted the scope language "in the broadest

manner possible." *Id*. at 40. The "scrap shavings" example ATS offers to illustrate its argument

is misguided in assuming that such a product necessarily would be found to be within the scope

of the Orders according to the Department's interpretation. The reasoning of the Final Scope

Ruling does not compel the conclusion that the scrap shavings ATS describes, which are not

produced so as to achieve a specific shape or form, would be "aluminum extrusions" as defined

by the scope language.

Where scope language in an order is ambiguous as to whether a particular good is

covered, the importer may resort to the Department's procedures for obtaining a scope ruling.

*See* 19 C.F.R. § 351.225(a) (Introducing scope ruling procedures and informing parties that

issues can arise as to whether a particular product is included within the scope of an antidumping

or countervailing duty order "because the descriptions of subject merchandise contained in the

Department's determinations must be written in general terms."). ATS has sought and obtained

such a scope ruling here. Dissatisfied with that ruling, plaintiff would have the court require

Commerce to formulate a narrower scope that defines a "reasonable limit on the types of further

manufacturing" a subject good may undergo, but regarding a "reasonable limit," plaintiff's

proffered interpretation of the scope language would require Commerce to decide in each case

whether a given degree of post-extrusion fabricating impermissibly altered the basic cross-

sectional shape, exceeded that which "prepared" the article "for assembly," or resulted in a

"substantial transformation." *See* Pl.'s Mem 44.  Such an approach would introduce

considerable vagueness and unpredictability, particularly as compared to the interpretation

Commerce adopted in the Final Scope Ruling.  A narrower scope is not necessarily a better

defined one.

ATS cites various judicial decisions in support of its notice and due process argument,

but these decisions do not establish a principle upon which the court must hold the Final Scope

Ruling unlawful.  Plaintiff relies, for example, upon *Mid Continent Nail Corp. v. United States*,

725 F.3d 1295, 1300-01 (Fed. Cir. 2013) for its explanation that the *Duferco* principle, which

ensures that antidumping duties are imposed on merchandise only by an order that reasonably

may be interpreted to include such merchandise, is grounded in the due process requirement of

fair warning to regulated parties.  Pl.'s Mem. 40.  Also, plaintiff quotes a sentence from the

opinion in *ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F.3d. 82, 90

(Fed. Cir. 2012), "Commerce's discretion to define and clarify the scope of an investigation is

limited by concerns for transparency of administrative actions." *Id*. at 41.  ATS opines,

additionally, that because the scope language relied upon by Commerce in the Final Scope

Ruling is "convoluted and vague," the court "should insist on construing the scope narrowly, so

as to avoid lack of notice to importers, just as courts generally construe ambiguities in insurance

contracts against the insurer."  Pl.'s Reply 22 (citations omitted).

Plaintiff's reliance on *Mid Continent Nail Corp.* and *Duferco* is unavailing because Commerce did not base the Final Scope Ruling on an unreasonable or impermissibly broad interpretation of the scope language.  The sentence from *ArcelorMittal* upon which ATS relies, when read in context, is seen to be not on point.  The Court of Appeals was addressing an antidumping duty order on stainless steel plate "4.75 mm or more in thickness."  *ArcelorMittal*, 694 F.3d. at 83.  Commerce previously had interpreted the dimension as a measurement that excluded merchandise with an actual thickness of less than 4.75 mm.  *Id.* at 88-89.  The case arose because Commerce, changing its position, began to interpret the scope language to include stainless steel plate of a nominal thickness of 4.75 mm, regardless of the actual thickness.  Concluding that Commerce "was not justified in finding the order ambiguous," the Court of Appeals reasoned that "Commerce is not at liberty to ignore the plain terms of an order in what appears to be, in retrospect, an effort to better reflect the intent of the petitioners."  *Id.* at 90.[7] Finally, plaintiff's argument that scope language should be construed narrowly, and against Commerce as the drafter, misstates the law as to interpretation of scope language, which is governed by the principles set forth in *Duferco* and subsequent, related decisions of the Court of Appeals, and in the Department's regulations.

## III. CONCLUSION

The court concludes that the Final Scope Ruling is based on a reasonable interpretation of the scope language and that Commerce permissibly applied the criteria of 19 C.F.R. § 351.225(k)(1) in determining that ATS's fittings are within the scope of the Orders.  Therefore,

---

[7] ATS also cites certain opinions of the Court of International Trade, none of which is on point.

the court will deny plaintiff's motion for judgment on the agency record and enter judgment

sustaining the Final Scope Ruling.

                                                 _/s/  Timothy C. Stanceu_
                                              Timothy C. Stanceu, Chief Judge

Dated:   December 6, 2017
           New York, NY